JUDGE McMAHON



11 CIV 9051

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TOM PALNY, Individually And On Behalf Of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>FOCUS MEDIA HOLDING LIMITED, JASON NANCHUN JIANG, CHARLES GUOWEI CAO, KIT LEONG LOW, DANIEL MINGDONG WU, ALEX DEYI YANG, NEIL NANPENG SHEN, FUMIN ZHUO, DAQING QI, DAVID ZHANG, AND YING WU,<br><br>                Defendants. | Civil Action No.:<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tom Palny ("Plaintiff") alleges the following based upon the investigation by his counsel, which includes, among other things: a review of public documents, media reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Focus Media Holding Limited ("Focus Media" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers (the "Class") of the American Depository Receipts ("ADRs") of Focus Media, who purchased or otherwise acquired the Company's ADRs between September 25, 2007 through November 21, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff purchased Focus Media ADRs as indicated in the annexed Certification at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Focus Media Holdings Limited is a Cayman Islands corporation that maintains its principal executive offices at 28-30/F, Zhao Feng World Trade Building, 369 Jiangsu Road, Shanghai 200050, People's Republic of China.  Focus Media is a multi-platform digital media company that operates a liquid crystal display ("LCD") network using audiovisual digital displays in China.  The Company sells out-of-home television advertising time slots on its network of flat-panel television advertising displays located in high traffic areas, such as

commercial locations, as well as an in-store network.  It provides advertising services on poster frames, on screens in movie theatres, and on traditional outdoor billboards, as well as through LCD display and Internet advertising networks.  The Company's ADRs trade on the NASDAQ Stock Market under the symbol "FMCN."

8.      Defendant Jason Nanchun Jiang ("Jiang") is the Company's founder and has served as the Chairman of Focus Media's board of directors ("Chairman" of the "Board") and the Company's Chief Executive Officer ("CEO") since May 2003.  Defendant Jiang was general manager of Aiqi Advertising, an advertising company founded by his immediate family members in 1997, which was renamed Focus Media Advertising in May 2003 in connection with the establishment of the Company's current business operations.  Defendant Jiang beneficially owns 19.3% of the Company's ordinary shares through his investment entity JJ Media Investment Holding Limited.  On September 13, 2010, Defendant Jiang sold 8,100,00 American Depositary Shares ("ADSs") at a price of $18.90 per share through JJ Media Investment Holding.

9.      Defendant Charles Guowei Cao ("Cao") has served as a Company director since November 2005.  Defendant Cao is also President and Chief Financial Officer of SINA, a leading online media company and information service provider for China.  Prior to joining SINA, defendant Chao served as an audit manager with PricewaterhouseCoopers LLP, providing auditing and business consulting services for high tech companies in Silicon Valley, California. Defendant Chao is a certified public accountant and a member of the American Institute of Certified Public Accountants.

10.      Defendant Kit Leong Low ("Low") has been the Chief Financial Officer ("CFO") of the Company since January 2010.  Defendant Low is a former executive director at the

Goldman Sachs Asia-Pacific Research Media and Internet team whose coverage includes media and internet companies in Greater China.

11.     Defendant Daniel Mingdong Wu ("Wu") had served as the Company's CFO from February 2005 until January 2010.

12.     Defendant Alex Deyi Yang ("Yang") has been a director of Focus media since September 2009 and the General Manager of the Company since January 2010.  Defendant Yang served as the Company's Acting CFO from January 2009 until January 2010, and as Focus Media's General Counsel from August 2004 until January 2009.

13.     Defendant Neil Nanpeng Shen ("Shen") has served as a Company director since December 2004.  Defendant Shen is also president and CFO of Ctrip.com International, a company he co-founded and for which he has served as an executive director since its inception in 2000. Prior to founding Ctrip, Defendant Shen worked for more than eight years in the investment banking industry in New York and Hong Kong.

14.     Defendant Fumin Zhuo ("Zhuo") has served as a Company director since December 2004.  In 1987, defendant Zhuo served as chief assistant officer of the Shanghai Economic System Reform Committee.  Defendant Zhuo has extensive experience in venture capital fund formation, mergers and acquisitions, and investment management.

15.     Defendant Daqing Qi ("Qi") has served as a Company director since February 28, 2006. Defendant Qi is professor of accounting and associate dean of the Cheong Kong Graduate School of Business, where he has taught since 2002.  From 1996 until 2002, defendant Qi was an associate professor in the School of Accountancy at the Chinese University of Hong Kong.

16.     Defendant David Zhang ("Zhang") has been a director of the Company since September 2007.  Defendant Zhang is also the managing director and head of the Beijing office of WI Harper, a private equity fund.

17.     Defendant Ying Wu ("Wu") is a director of the Company.

18.     The defendants identified in paragraphs 8 through 17 are collectively referred to herein as the "Individual Defendants."

19.     The Individual Defendants and Focus Media are collectively referred to herein as "Defendants."

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

20.     On September 25, 2007, Focus Media filed its annual report for the period ending December 31, 2006 with the SEC on Form 20-F (the "2006 Form 20-F").  In that 2006 Form 20-F, the Company reported that it had engaged in several acquisitions, including that of Framedia, Target Media, Focus Media Wireless, and Allyes.  The 2006 Form 20-F stated that these acquisitions "form part of . . . [the Company's] strategy to further expand . . . [its] business."  The Company further represented in its 2006 Form 20-F that "[i]f we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business."  The 2006 Form 20-F further stated:

> In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, Allyes and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

21.     Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of Allyes and the other companies acquired by Focus

Media in 2007 were materially false and misleading.  As alleged more fully below, in a research report dated November 21, 2011 (the "Research Report"), Muddy Waters, LLC ("Muddy Waters") reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value).  Muddy Waters disclosed that by November 2011, Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration.  Muddy Waters reported that many of these write-downs were not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors.  In addition, Muddy Waters disclosed that certain Focus Media insiders, including Defendant Jiang, had used the Company as their counterparty in trading in and out of Allyes, earning a total of at least $70.1 million, while the Company's shareholders ultimately lost $159.6 million.

22.     In addition, Defendants also knew, or recklessly disregarded, that the cautionary language in the 2006 Form 20-F concerning the acquisitions was materially false and misleading because Defendants deliberately overpaid for these acquisitions, all but ensuring that Focus Media would incur costs, including those relating to intangibles or goodwill, in excess of its projected costs for these transactions.

23.     On May 6, 2008, Focus Media filed its annual report for the period ending December 31, 2007 with the SEC on Form 20-F (the "2007 Form 20-F").  In that 2007 Form 20-F, the Company reported that it had engaged in several acquisitions, including that of Framedia, Target Media, Focus Media Wireless, Allyes, CGEN and other smaller acquisitions.  The 2007 Form 20-F stated that these acquisitions "form part of . . . [the Company's] strategy to further expand . . . [its] business."  The Company further represented in its 2007 Form 20-F that "[i]f we

are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business." The 2007 Form 20-F further stated:

> In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, Allyes, CGEN and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

24.     Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of Allyes, CGEN and the smaller companies acquired by Focus Media in 2007 were materially false and misleading. As alleged more fully below, in its Research Report, Muddy Waters reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value). Muddy Waters disclosed that Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration. Muddy Waters reported that many of these write-downs were not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors. In addition, Muddy Waters disclosed that certain Focus Media insiders, including Defendant Jiang, had used the Company as their counterparty in trading in and out of Allyes, earning a total of at least $70.1 million, while the Company's shareholders ultimately lost $159.6 million.

25.     In addition, Defendants also knew, or recklessly disregarded, that the cautionary language in the 2007 Form 20-F concerning the acquisitions was materially false and misleading because Defendants deliberately overpaid for these acquisitions, all but ensuring that Focus

Media would incur costs, including those relating to intangibles or goodwill, in excess of its projected costs for these transactions.

26.    On October 24, 2007, the Company filed a Registration Statement on Form F-1 with the SEC for an offering of 5,000,000 ADSs by Focus Media, as well as an additional 8,720,873 ADSs by various selling shareholders (the 2007 Form F-1").  In that 2007 Form F-1, the Company reported that it had engaged in several acquisitions, including that of Framedia, Target Media, Focus Media Wireless, ACL and Allyes.   The Form F-1 stated that these acquisitions "form part of . . . [the Company's] strategy to further expand . . . [its] business." The Company further represented in its 2007 Form F-1 that "[i]f we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business."  The 2007 Form F-1 further stated:

> In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, ACL, Allyes, and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

27.    Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of Allyes and other companies acquired by Focus Media in 2007 were materially false and misleading.   As alleged more fully below, in its Research Report, Muddy Waters reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value).  Muddy Waters disclosed that Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration.  Muddy Waters reported that many of these write-downs were

not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors. In addition, Muddy Waters disclosed that certain Focus Media insiders, including Defendant Jiang, had used the Company as their counterparty in trading in and out of Allyes, earning a total of at least $70.1 million, while the Company's shareholders ultimately lost $159.6 million.

28.     In addition, Defendants also knew, or recklessly disregarded, that the cautionary language in the 2007 Form F-1 concerning the acquisitions was materially false and misleading because Defendants deliberately overpaid for these acquisitions, all but ensuring that Focus Media would incur costs, including those relating to intangibles or goodwill, in excess of its projected costs for these transactions.

29.     On November 7, 2007, Focus Media filed a Prospectus with the SEC on Form 424B4 relating to its offering of 5,000,000 ADSs and the offering of certain selling shareholders of 8,720,873 ADSs ("2007 Prospectus"). In that 2007 Prospectus, the Company reported that it had engaged in several acquisitions, including that of Framedia, Target Media, Focus Media Wireless, ACL and Allyes. The 2007 Prospectus stated that these acquisitions "form part of . . . [the Company's] strategy to further expand . . . [its] business." The Company further represented in its 2007 Prospectus that "[i]f we are presented with appropriate opportunities, we may acquire additional businesses, services or products that are complementary to our core business." The 2007 Prospectus further stated:

> In addition, we cannot assure you that we will be able to realize the benefits we anticipate from acquiring Framedia, Target Media, Focus Media Wireless, ACL, Allyes, and other companies, or that we will not incur costs, including those relating to intangibles or goodwill, in excess of our projected costs for these transactions. The occurrence of any of these events could have a material and adverse effect on our ability to manage our business, our financial condition and our results of operations.

30.     Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of Allyes and other companies acquired by Focus Media in 2007 were materially false and misleading.  As alleged more fully below, in its Research Report, Muddy Waters reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value).  Muddy Waters disclosed that Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration.  Muddy Waters reported that many of these write-downs were not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors.  In addition, Muddy Waters disclosed that certain Focus Media insiders, including Defendant Jiang, had used the Company as their counterparty in trading in and out of Allyes, earning a total of at least $70.1 million, while the Company's shareholders ultimately lost $159.6 million.

31.     In addition, Defendants also knew, or recklessly disregarded, that the cautionary language in the 2007 Prospectus concerning the acquisitions was materially false and misleading because Defendants deliberately overpaid for these acquisitions, all but ensuring that Focus Media would incur costs, including those relating to intangibles or goodwill, in excess of its projected costs for these transactions.

32.     On June 30, 2009, the Company filed its annual report for the period ending December 31, 2008 with the SEC on Form 20-F ("2008 Form 20-F").  In that 2008 Form 20-F, the Company stated:

> Since we commenced our current business operations in May 2003, we have acquired numerous companies to expand the coverage of our network in China and to acquire businesses that are complementary to our operations.

10

*     *     *

> In 2007, we also made a number of smaller acquisitions, which, due to the smaller size, does not necessitate our providing their financial statements on a stand alone basis. Among these smaller acquisitions, we acquired eight regional distributors in our digital out-of-home network, five local poster frame companies, ten companies in the mobile advertising sector and six Internet advertising companies (excluding Allyes). No one of these acquisitions was material to our business.

33.     Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of the companies acquired by Focus Media in 2007 were materially false and misleading.  As alleged more fully below, in its Research Report, Muddy Waters reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value).  Muddy Waters disclosed that Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration.  Muddy Waters reported that many of these write-downs were not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors.

34.     On June 29, 2010, the Company filed its annual report for the period ending December 31, 2009 with the SEC on Form 20-F ("2009 Form 20-F").  In that 2009 Form 20-F, the Company reported:

> Since we commenced our current business operations in May 2003, we have acquired numerous companies to expand the coverage of our network in China and to acquire businesses that are complementary to our operations.

*     *     *

> We acquired six entities in the poster-frame advertising segment for cash consideration of $1.2 million in 2008. We recognized acquired intangible assets of $7.9 million and recognized goodwill of $0.4 million, which was assigned to the poster fame advertising services segment. Part of the purchase consideration is contingent and is based on earnings targets for three years subsequent to the

acquisition, subject further to the attainment of certain operational targets. The purchase price allocation cannot be completed until the contingent consideration is resolved. As such, we recorded a liability of $7.4 million, which was equal to the excess of the fair value of the assets acquired over cost on the date of acquisition.

We acquired two entities which provide Internet advertising service for nil cash consideration in 2008. We recognized acquired intangible assets of $0.7 million. Part of the purchase consideration is contingent and is based on earnings targets for three years subsequent to the acquisition, subject further to the attainment of certain operational targets. The purchase price allocation cannot be completed until the contingent consideration is resolved. As such, we recorded a liability of $0.7 million, which was equal to the excess of the fair value of the assets acquired over cost on the date of acquisition. In 2009 through a series of transactions, we sold of our equity interest in these two entities back to their original owners.

35.     Defendants knew, or recklessly disregarded, that the foregoing statements concerning the reasons for the acquisitions of the companies acquired by Focus Media in 2008 were materially false and misleading.  As alleged more fully below, in a research report dated November 21, 2011, Muddy Waters reported that that Focus Media deliberately overpaid for these acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005 (such write-downs being equivalent to one-third of the Company's present enterprise value).  Muddy Waters disclosed that Focus Media had written at least 21 of its acquisitions down to zero and then given them away for no consideration.  Muddy Waters reported that many of these write-downs were not justified, and it was possible that the Company gave these acquisitions away to conceal losses from its outside auditors.

36.     In addition, in that 2009 Form 20-F, the Company reported the sale of a 38% interest in Allyes to, among others, certain members of Focus Media's management and directors for $13.3 million in January 2010:

In January 2010, certain Allyes employees and management and directors and certain members of our management and directors entered into a definitive agreement with us and Allyes in January 2010 to buy-out an aggregate 38%

interest in Allyes from us. Pursuant to the terms of the agreements, the purchasing Allyes and Group management members paid an aggregate $13.3 million for a 38% interest of Allyes. The Group performed a valuation of Allyes as of the closing date of the transaction and determined that the price paid to acquire the interest approximated fair value. The transaction was approved by all independent directors on the board. This transaction was part of initiatives we are taking to incentivize management to enhance the future business model of Allyes and thereby to seek long term sustainable growth for the Group and investors.

37.    Defendants knew, or recklessly disregarded, that the statements concerning the determination that that the price paid to acquire that 38% interest approximated fair value were materially false and misleading because Defendants failed to disclose that the price paid in the transaction implied a full value of $35 million for Allyes.  A summary financial statement for Allyes prepared as July 30, 2010, a mere seven months later, showed that Allyes had a book value that was more than $58 million, including cash and equivalents of more than $40 million. In fact, Focus Media sold its remaining 62% interest in Allyes to Silver Lake Management, L.L.C. ("Silver Lake") on July 30, 2010 for $124 million.  The price paid by Silver Lake implied a full value of $200 million for Allyes, rather than the implied $35 million value represented by the January 2010 purchase price of $13.3 million paid by the Company insiders for their 38% stake in Allyes.

38.    According to the November 2011 Muddy Waters research report, a few days after buying Focus Media's 62% stake in Allyes, on August 3, 2010, Silver Lake purchased an additional 27.8% of Allyes from Company insiders for an additional $57 million.  Accordingly, Silver Lake purchased an aggregate 90.8% of Allyes for $181 million.  The Focus Media insiders who sold to Silver Lake, thus, received 5.7 times what they had paid for their interest in Allyes seven months earlier.

39.    On December 12, 2010, the Company filed an amended annual report for the year ended December 31, 2009 with the SEC on Form 20-F/A ("2009 Form 20-F/A").  In that 2009

Form 20-F/A, Focus Media reported that on April 30, 2008, it had disposed of eight mobile handset services companies, including: Shenzhen Julan; Guangzhou Xuanwu; Shenhzhen Mengwang; Beijing Shiji Zongkai; and Jingzhun.   The Company also reported that it had disposed of mobile handset service company Dongguan Yaya on February 28, 2009.   Focus Media reported that it disposed of these companies by selling them back to their original owners at an aggregate loss of $41.8 million.   The Company stated that these dispositions resulted from a March 2008 Ministry of Information Industry order for all telecoms to tighten up regulation of short messaging services, as well as anticipated regulatory changes that would require the consent of the mobile phone user to receive messages by short messaging services.

40.     Defendants knew, or recklessly disregarded, that the statements concerning the ownership and disposition of the above-referenced mobile handset services companies were materially false and misleading because Focus Media had never, in fact, acquired these companies.   In its November 2011 research report, Muddy Waters stated that SAIC files and other research indicated that Focus Media did not actually own these companies during the time period in which it claims it did.   Moreover, Muddy Waters reported that it had determined that the Company had not acquired these companies as Variable Interest Entities ("VIES") under Chinese law because there was no recorded pledge of equity for these companies, nor any changes in the shareholders, directors, or legal representatives of the companies, which is typical in the acquisition of a VIE.   Further, Muddy Waters reported that it had spoken "with multiple companies in this group, and each confirmed that  . . . [Focus Media] never owned or controlled them."

41.     On June 20, 2011, Focus Media filed its annual report for the period ending December 31, 2010 with the SEC on Form 20-F ("2010 Form 20-F").   In that 2010 Form 20-F,

the Company disclosed that on March 7, 2011, it had entered into a definitive equity transfer agreement to transfer a 30% interest in its Shanghai Hua Guang Chuanzhi OOH Ltd. subsidiary ("OOH") to an entity controlled by Goldman Sachs and a 19% interest to certain members of the management of Focus Media and OOH for $21 million and $13.3 million, respectively.  The Company stated that the sale was part of its "continued effort to divest non-core business . . . ."

42.     Defendants knew, or recklessly disregarded, that the statements concerning the reasons for the sale of the 49% stake in OOH was materially false and misleading.  In its November 2011 research report, Muddy Waters stated that OOH "is expected to launch a public offering on the Shanghai Stock Exchange in 2012," citing a November 27, 2010 "Weekly Report – Chinese M&A Intelligence" by mergermarket.  According to Muddy Waters, Focus Media management invested in OOH in order to improperly profit from the anticipated IPO of the Company's subsidiary.  Thus, the sale of the 19% stake in OOH to these Company insiders was not, in fact, part of Focus Media's continuing effort to divest its non-core businesses.

43.     Muddy Waters further stated in its November 2011 research report that Focus Media even went so far as to divesting itself of a 33% interest in a profitable joint venture with internet advertising agency Dentsu Inc. ("Dentsu") called "&c. Inc." at below market value in order to facilitate the anticipated public offering of OOH.  According to Muddy Waters, Shanghai Stock Exchange Rules would prevent the listing of OOH on the Shanghai Exchange while its parent simultaneously held a stake in &c, Inc.  Muddy Waters noted that the Company contributed a $3 million in equity at the formation of &c, Inc. in exchange for its 33% stake in May 2008.  According to Muddy Waters, &c, Inc.'s Chinese regulatory filings with the State Administration for Industry & Commerce ("SAIC"), showed that its revenues rapidly grew, from $26.8 million in 2008 to $111.9 million in 2010.  Further, Muddy Waters reported that &c. Inc.

had a book value of $25 million, with cash and receivables of $36 million.  Despite these facts, Focus Media sold its 33% stake back to Dentsu for $2.2 million, less than its initial equity contribution.

44.     In its 2010 Form 20-F, the Company also stated that "[t]he majority of displays on our LCD display network are currently placed in heavy-traffic areas of commercial office buildings."

45.     Defendants knew, or recklessly disregarded, that the foregoing statement concerning the placement of the majority of Focus Media's LCD display network was materially false and misleading.  In the November 2011 research report, Muddy Waters reported that:

> [O]nly approximately 30% of FMCN's screens network-wide are in commercial buildings. In Tier I cities, only approximately 45% of FMCN's screens are in office buildings. In Tier II cities, only approximately 30% of screens are in office buildings. The balance of screens is substantially all in residential buildings. Residential buildings are inherently less valuable to advertisers than are office buildings. One floor of an office building typically has as much traffic as an entire residential tower.

46.     On November 17, 2011, the Company issued a press release announcing unaudited financial results for the third quarter ended September 30, 2011.  In that release, the Company stated:

> As of September 30, 2011, the total installed base of LCD displays in our LCD display network was 178,382 nationwide, including 169,810 displays through our directly owned networks, and 8,572 displays through our regional distributors, as compared to total LCD displays of 169,798 as of June 30, 2011. The total number of non-digital frames available for use in our poster frame network was 391,304 as of September 30, 2011, as compared to 354,945 as of June 30, 2011. In addition, as of September 30, 2011, we had 34,711 digital frames installed in our poster frame network, a slight decrease from 35,217 as of June 30, 2011 due to optimization of the network. The total number of displays installed in our in-store network was 50,696 as of September 30, 2011, as compared to 50,129 as of June 30, 2011.

47.     Defendants knew, or recklessly disregarded, that the statements indicating that the Company had a total installed base of 178,382 LCD displays it its LCD display network was materially false and misleading.  In its November 2011 research report, Muddy Waters states that despite the Company's claim that it has 178,382 LCD displays, in its Media Kit, Focus Media states that it has only 120,000, including about 15,000 screens that the Company has access to through distribution agreements.

### THE TRUTH IS REVEALED

48.     Four days after the Company's issuance of the press release concerning its third quarter 2011 financial results, Muddy Waters issued the Research Report with a "Strong Sell" recommendation for Focus Media.   In that Research Report, Muddy Waters stated:

### I. Introduction – FMCN: The Olympus of China

Muddy Waters rates Focus Media Holding Ltd. (NASDAQ: FMCN) shares a Strong Sell because of significant overstatement of the number of screens in its LCD network and its Olympus-style acquisition overpayments. The $1.1 billion in write-downs from its acquisitions exceed one-third of FMCN's enterprise value, making FMCN's acquisitive behavior more destructive than Olympus's to shareholder value. FMCN insiders have sold at least $1.7 billion worth of stock (two-thirds of FMCN's enterprise value) since FMCN's IPO. 2 At the same time, the insiders and their business associates further enrich themselves by trading in FMCN assets, while costing FMCN shareholders substantial sums of money.

- FMCN has been fraudulently overstating the number of screens in its LCD network by approximately 50% – particularly in Tier I cities. FMCN claims to operate 178,382 screens, but the actual number in FMCN's media kit is less than 120,000. This is similar to China MediaExpress Holdings, Inc. (OTC: CCME), which we reported is a fraud on February 3, 2011. We therefore question whether FMCN's core LCD business is viable.

- Like Olympus, FMCN is significantly and deliberately overpaying for acquisitions, writing down $1.1 billion out of $1.6 billion in acquisitions since 2005. These write-downs are equivalent to one-third of FMCN's present enterprise value. FMCN's overpayments include fraudulently booking at least six mobile handset advertising acquisitions that it never made.

17

Olympus's situation may explain why FMCN overpays for acquisitions. Olympus management has stated that Olympus deliberately overpaid for acquisitions in order to disguise losses on investments. Questions remain about whether individuals associated with these transactions also pocketed the money, and / or whether the acquisitions were really used to cover losses in Olympus's seemingly robust core business.

Like Olympus, FMCN could be hiding losses through its overpayments – this is particularly plausible, given its overstatement of LCD screens. Another possible reason FMCN overpays for acquisitions could include recycling acquisition consideration back into FMCN's revenue line. It is also possible that capex is being misappropriated, which is probably the most common reason for capital expenditure inflation in China.

- Our research shows that FMCN has claimed to acquire, write down, and dispose of companies that it never actually purchased. Investors should be concerned about to where cash actually moved in these transactions, and about the integrity of reported results.

- FMCN has written at least 21 acquisitions down to zero and then given them away for no consideration. We show that many of these write-downs are not justified. There are several possible nefarious reasons FMCN gives acquisitions away, including doing so may put FMCN's problems beyond the reach of auditors.

- Insiders have used FMCN as their counterparty in trading in and out of FMCN subsidiary Allyes, with several individuals earning a total of at least $70.1 million, while shareholders lost $159.6 million.

- Sales of FMCN shares by insiders have netted them at least $1.7 billion since FMCN went public in 2005.

- FMCN took a rare winner and sold it for a loss to its joint venture partner. FMCN had invested in an internet advertising JV with Dentsu, and the JV looks to have been doing phenomenally well. Last year, FMCN transferred the entirety of its shares to Dentsu for less than FMCN had invested in the company. We suspect that the reason for the bargain sale was to clear the way for FMCN insiders to enter into another self-dealing transaction.

- FMCN insiders have maneuvered themselves to the front of the line to cash in on the expected IPO of one of FMCN's subsidiaries. Insiders and an investment bank that is financing their purchase of shares have acquired 49% of Hua Guang. Shareholders will likely see tens of millions of dollars in losses from this transaction.

- FMCN's board is incapable of exercising good corporate governance. It is too well-paid and connected to management through business transactions outside of FMCN.

Muddy Waters believes that many of the items we discuss in this report are symptomatic of a highly troubled enterprise that is run solely for the benefit of insiders. The problems we have uncovered are likely the tip of the iceberg, and in some cases may reflect periodic medicine that must be given to FMCN in order to keep up appearances of health. While some of the behavior we discuss occurred before 2010, investors should ask themselves whether management has successfully completed a 12- step program to stop abusing shareholders. Recent self-dealing transactions indicate that is unlikely. [Footnotes omitted.]

49.    In the Summary section of the Research Report, Muddy Waters provided a brief

synopsis of its findings:

**IV. Summary**

*LCD Screen Fraudulent Overstatement and Misrepresentations*

FMCN materially overstates the number of LCD screens in its core business. FMCN's SEC filings state that it has 178,3828 screens, while according to its media kit, it has fewer than 120,000, a 50% overstatement. It actually has fewer than 30,000 screens in Tier I cities, despite claiming to have in excess of 50,000 Tier I screens. (We estimate that Tier I effective advertising rates are approximately 141.9% higher than those of Tier II cities.)

FMCN claims that the majority of its LCD screen network is in "heavy-traffic areas of commercial office buildings";10 however, network-wide only approximately 30% of screens are in office buildings. The remainder of the screens is almost all in residential buildings. Residential buildings result in far fewer impressions for advertisers than do office buildings. The number of people who work on one floor of an office building is roughly equivalent to the number of people living in a whole residential tower.

Residential buildings therefore tend to have about 5% of the impressions that office buildings do.

*Goodwill Hunting at the Olympus Games*

It is indisputable that FMCN routinely overpays for acquisitions. It has written off $1.1 billion out of approximately $1.6 billion in acquisitions. 11 (The total of write-downs is greater than one-third of FMCN's present enterprise value, and is responsible for FMCN's accumulated deficit since going public of $437.4 million.12) A Tyco-esque $902.3 million of these write-downs were of goodwill. After taking these write-downs, FMCN gave away, for no consideration, at least 21 of the companies it had acquired – including one that had not been disclosed.

We believe that FMCN could be unjustifiably impairing to zero and giving away these companies in order to move its problems out of sight from its auditors, or because it is returning borrowed businesses (along with borrowed revenue and profit).

The question is whether this abysmal track record is due to management merely being incompetent, or whether they are deliberately overpaying. Based on our research into the following transactions, we have no doubt that FMCN's overpayments are deliberate – just as Olympus's are. The following transactions support that thesis:

- Six mobile handset advertising companies that FMCN never actually acquired. FMCN claimed to acquire these companies between 3/1/2007 and 10/1/2007 for total consideration of $46.3 million.1314 FMCN then claimed to impair these companies to zero in 2008, and return them to their original shareholders. However, the acquisitions (and obviously disposals) never occurred. The fact that these acquisitions never occurred has important implications for the whereabouts of the cash FMCN claimed to pay, as well as the integrity of FMCN's reported results.

  \*       \*       \*

- Allyes, an internet advertising company. FMCN acquired Allyes for $296.9 million, and wrote it down to $78.5 million nine months later. Chairman & CEO Jason Jiang, board member & venture capital star Neil Shen, and close business associate of Mr. Jiang & venture capital star Xiong Xiangdong were among the selling shareholders of Allyes at the rich price. (Jiang, Xiong, and others would subsequently trade into Allyes at an even lower valuation of $35 million, 21 and then personally make tens of millions of dollars while shareholders racked up total losses on Allyes of $159.6 million.)

- CGEN, a now defunct direct competitor of FMCN's in the in-store advertising space that turned into a $198.4 million loss for FMCN. CGEN was such a dramatic failure that Muddy Waters does not believe the acquisition was made in good faith. FMCN bought this company for $168.4 million and repaid a $30.0 million loan CGEN owed,24 to impair it only 11 months later to zero. The purported rationale for acquiring CGEN is bizarre – that essentially FMCN would use CGEN as leverage over substantially larger hypermarket chains, and coerce them into letting CGEN break its existing leases. This was clearly a far-fetched idea.

After writing CGEN down, FMCN gave it away to a company that is associated with the aforementioned Xiong Xiangdong (see Allyes supra).  That FMCN

needed a friendly party to act as the trash receptacle for CGEN only heightens our suspicions about this transaction.

- FMCN made a string of six small acquisitions in the internet advertising space. These acquisitions were near total losses for FMCN, but provided benefit to businesses associated with certain FMCN board members. During the period in which FMCN owned these companies (between 2007 to 2009), these acquisitions along with Allyes gave FMCN a reason to spend $198.3 million (up from zero in 2006) between 2007 and 2010 on leasing online advertising space from related parties in which certain board members had interests.

*Impairing Judgment*

We conclude that FMCN generally desires to impair its acquisitions – including the six phantom acquisitions it never made. Even assuming FMCN had made the phantom acquisitions, it has still overstated its losses on disposal in the Mobile segment by at least $26.1 million, which is a clear warning sign of cooked books. In at least 21 instances, FMCN has written acquisitions down to zero and given the companies away—usually back to their original shareholders. The rationale for many of these write-downs is doubtful. These unnecessary impairments, often followed by giveaways, could serve several nefarious purposes, including making it harder for auditors to detect problems.

Among the acquisitions we believe were unjustifiably impaired are:

- Ten mobile handset advertising companies, six of which FMCN never actually acquired. If FMCN never acquired them, obviously it should not impair them. However, FMCN took an impairment charge of $41.8 million on these six "acquisitions." Even if they had acquired these six firms, the loss on disposal of these 10 companies appears overstated by $26.1 million. This overstatement may indicate cooked books.

*       *       *

- Allyes Information Technology Company Limited was impaired a second time (after being impaired from $296.9 million to $78.5 million)37 to $32.3 million in order to allow insiders to purchase 38% of it at a bargain price (*see infra* All(Directors Say)Yes to Enriching Insiders). The purchasing insiders flipped the stake seven months later at an implied valuation of $200 million, which is an annualized IRR of 2,127.2%.

*All(Directors Say)Yes to Enriching Insiders*

FMCN is run primarily for the benefit of insiders.

- The most egregious example of insiders' self-dealing at the expense of shareholders is their use of FMCN to trade in and out of Allyes. We conservatively estimate that these transactions netted insiders $70.1 million. FMCN shareholders lost $159.6 million as a result of these transactions.

- Insiders are continuing to trade against FMCN shareholders in valuable assets even this year – insiders and an investment bank acquired from FMCN 49% of a profitable traditional billboard advertising company that is likely to go public in 2012. The investment bank financed the insiders' purchase, presenting an even greater conflict of interest between insiders and shareholders.

- In the public market, insiders have sold at least $1.7 billion of shares since FMCN went public. With quarterly share grants running around $14 million, insiders ensure a constant supply of shares to sell. We believe that shareholders are mistaken if they think that FMCN's share buyback is for their benefit – this perpetual issue (to insiders) and buyback cycle is merely a less noticeable way of transferring money from the shareholders to insiders.

- The board is unable to exercise proper governance, as it consists of individuals who are too highly compensated by FMCN. Furthermore, most of the insiders are deeply entangled with one another in business transactions outside of FMCN – in a number of cases, these transactions involve venture-capital deals, and transactions with other Chinese public companies.  [Footnotes omitted.]

50.     Following the issuance of the Muddy Waters Research Report, the price of Focus Media ADRs dropped precipitously from a close of $25.50 per ADR on November 18, 2011 (the last full trading day prior to the issuance of the Research Report), to a close of $15.43 per ADR on November 21, 2011, the day that the Research Report was issued, a drop of approximately 40%.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or

otherwise acquired Focus Media's ADRs between September 25, 2007 through November 21, 2011, inclusive, seeking to pursue remedies under the Exchange Act (the "Class").

52.     The members of the Class are so numerous that joinder of all members is impracticable.  As of June 9, 2011, a total of 135,624,425 ADSs were outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Focus Media or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Focus Media; and

(c)     whether the members of the Class have sustained damages and, if so, the

proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## LOSS CAUSATION

57.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Plaintiff and the Class.

58.     During the Class Period, Plaintiff and the Class purchased ADRs of Focus Media

at artificially inflated prices and were damaged thereby.  The price of Focus Media's ADRs

significantly declined when the misrepresentations made to the market, and/or the information

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

causing investors' losses.

## SCIENTER ALLEGATIONS

59.     Defendants acted with scienter because they: (i) knew that the public statements

issued or disseminated in the name of the Company were materially false and misleading; (ii)

knew that such statements would be issued or disseminated to the investing public; and (iii)

knowingly and substantially participated or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the federal securities laws.

60.     As set forth herein, the Individual Defendants, by virtue of their receipt of

information reflecting the true facts regarding Focus Media, their control over, receipt and/or

modification of Focus Media's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Focus Media, participated in the fraudulent scheme alleged herein.

61.     Defendants knew, or recklessly disregarded, that despite the Company's publicly representations that the acquisitions described above were either not, in fact, consummated, or such acquired assets were disposed of at prices far below their true value in order to benefit certain Company insiders, as alleged above.

62.     Defendants also knew, or recklessly disregarded, that the Company's public statements concerning the size and market concentration of its LCD screen network were materially false and misleading as alleged above because the number and location of the LCD screens in that network were part of the Company's core business from which Focus Media derived the overwhelming majority of its revenues.  Defendants, therefore, were privy to regular and periodic reports concerning the size and market concentration of these assets.

**Applicability of Presumption of Reliance:**
**<u>Fraud On The Market Doctrine</u>**

63.     At all relevant times, the market for Focus Media's securities was an efficient market for the following reasons, among others:

(a)     Focus Media's stock was traded on the NASDAQ exchange with trading volume of in the hundreds of thousands or millions of ADRs throughout the Class Period;

(a)     As a regulated issuer, Focus Media filed periodic public reports with the SEC;

(b)     Focus Media regularly communicated with public investors via

25

established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Focus Media was followed by several securities analysts during the Class Period which were publicly available and entered the public marketplace, including CIBC World Markets; Citigroup; Credit Suisse; Deutsche Bank Asia China; Goldman Sachs & Co.; Merrill Lynch (Hong Kong); Morgan Stanley Research Asia/Pacific; Piper Jaffray & Co.; Roth Capital Partners; and SIG.

64.     As a result of the foregoing, the market for Focus Media's ADRs promptly digested current information regarding the Company from all publicly-available sources and reflected such information in Focus Media's ADR price.   Under these circumstances, all purchasers of Focus Media's ADRs during the Class Period suffered similar injury through their purchase of Focus Media ADRs at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Focus Media who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Focus Media ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Focus Media's ADRs stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Focus Media's financial well-being, business relationships, and prospects, as specified herein.

70.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Focus Media's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Focus Media and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Focus Media's ADRs during the Class Period.

71.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of the Company's ADRs.

72.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Focus Media's ADRs was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Focus Media's ADRs were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by Defendants, or upon the integrity of the market in which the ADRs trade, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Focus Media ADRs during the Class Period at artificially high prices and were damaged thereby.

73.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the truth about the Company's various acquisitions and LCD network, and the true financial condition of the Company, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Focus Media ADRs, or, if they had acquired such ADRs during the Class Period, they would not have done so at the artificially inflated prices which they paid.

74.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Focus Media within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and awareness of the Company's operations and/or intimate knowledge of the false statements in connection with the various acquisitions made during the Class Period and the Company's LCD network, and the financial condition of the Company that were disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to data about the acquisitions and the LCD network, and the financial condition of the Company, issued the statements that Plaintiff alleges are materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

78.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by his acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: December 9, 2011

RIGRODSKY & LONG, P.A.

By: _____
Seth D. Rigrodsky
sdr@rigrodskylong.com
Timothy J. MacFall
tjm@rigrodskylong.com
Scott J. Farrell
sjf@rigrodskylong.com
825 East Gate Boulevard, Suite 300
Garden City, NY  11530
Tel.:  (516) 683-3516
Fax:  (302) 654-7530

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Tom Palny ("Plaintiff"), hereby declare as to the following claims asserted under the federal securities laws that:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or to participate in this action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition or trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in Focus Media Holding Limited (Nasdaq: FMCN) securities that are the subject of this action:

| No. of Shares | Stock Symbol | Buy/Sell | Transaction Date | Price Per Share |
|---|---|---|---|---|
|  |  |  |  |  |
| See Attached Schedule A |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*Please list additional transactions on separate sheet of paper, if necessary.*

5. Plaintiff will actively monitor and vigorously pursue this action for the Class' benefit.

6. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification: N/A                .

Tom Palny
8.12.11

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as the Court orders or approves.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this ___ day of December, 2011.

_____
TOM PALNY

**Schedule A to Certification of Tom Palny**
**Pursuant to the Federal Securities Laws**

| No. of Shares | Stock Symbol | Buy/Sell | Transaction Date | Price Per Share |
|---|---|---|---|---|
| 1,000 | FMCN | Buy | 10/6/2011 | $22.6993 |
| 1,000 | FMCN | Sell | 10/7/2011 | $22.2008 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7576 |
| 100 | FMCN | Buy | 10/14/2011 | $26.759 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7553 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7558 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7579 |
| 100 | FMCN | Buy | 10/14/2011 | $26.755 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7539 |
| 100 | FMCN | Buy | 10/14/2011 | $26.7593 |

3