UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

XUECHEN YANG, Individually and on Behalf of
All Others Similarly Situated,

        Plaintiff,

    -against-

FOCUS MEDIA HOLDING LIMITED, JASON
NANCHUN JIANG, CHARLES GUOWEI CAO,
KIT LEONG LOW, DANIEL MINGDONG WU,
ALEX DEYI YANG, NEIL NANPENG SHEN,
FUMIN ZHUO, DAQING QI, DAVID ZHANG,
and YING WU,

        Defendants.

—————————————————————————x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/4/14___
```

11 Civ. 9051 (CM) (GWG)

## DECISION AND ORDER APPROVING SETTLEMENT AND AWARDING ATTORNEYS' FEES AND EXPENSES

McMahon, J.:

Currently before the Court is a motion from Lead Plaintiff, Xuechen Yang ("Plaintiff"),

for final approval of the Settlement of this action as set forth in the Stipulation of Settlement (the

"Stipulation").[1] Plaintiff has achieved a $3.7 million cash settlement (the "Settlement Amount")

on behalf of the Class. For the reasons set forth below, the Court approves the settlement, and

also grants the motion by Plaintiff's counsel for an award of attorneys' fees.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 2012, Tom Palny filed a class action complaint against Focus Media

Holding Limited ("Focus Media" or the "Company"), as well as its various directors and officers,

---

[1] All capitalized terms not otherwise defined have the definitions set forth in the Stipulation. D.E. 29.

on behalf of the purchasers of the Company's American Depository Shares ("ADSs") during the period of September 25, 2007 through November 21, 2011, inclusive, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5). D.E. 1.

During the Class Period, Focus Media was a Cayman Islands corporation with operations in the People's Republic of China (the "PRC" or "China"). D.E. 22 ¶ 7. The ADSs of Focus Media traded on Nasdaq Global Select Market. *Id.* Focus Media was a multi-platform digital media company that operated a liquid crystal display ("LCD") network using audiovisual digital displays, as well as a fixed image poster network in China. *Id.* The Company sold out-of-home television advertising time slots on its network of flat-panel television advertising displays located in high traffic areas, such as commercial locations, as well as an in-store network. *Id.*

On February 13, 2012, Plaintiff filed an unopposed motion for appointment as lead plaintiff in this action under the Private Securities Litigation Reform Act of 1995, as amended (the "PSLRA"). D.E. 6. On March 30, 2012, the Court granted that motion. D.E. 12. Thereafter, Plaintiff engaged in efforts to effect service on the Company by serving its Registered Office in the Cayman Islands pursuant to the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"). Declaration of Timothy J. MacFall, Esq., dated August 14, 2014, ¶ 9 ("MacFall Declaration" or "MacFall Decl.").

Following a failed effort at service, due to an administrative error by the Cayman authorities, Focus Media's Registered Office was served pursuant to the Hague Convention on January 23, 2014.[2] MacFall Decl. ¶ 9. Thereafter, counsel for the Company entered an appearance

---

[2] To date, the Individual Defendants have not been served. MacFall Decl. ¶ 9.

in the Action. D.E. 18. Counsel for the parties met and conferred concerning the scheduling in the Action, including the filing of an amended complaint and Focus Media's anticipated motion to dismiss. MacFall Decl. ¶ 10. On March 12, 2014, Plaintiff filed an Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint") reflecting certain events that had transpired subsequent to the filing of the original complaint. D.E. 22.

In the Amended Complaint, Plaintiff alleged that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by knowingly, or at least recklessly, making false and misleading representations to investors concerning certain of its acquisitions, as well as certain transactions between the Company's insiders and its subsidiaries, such as management's purchase and subsequent sale of an interest in Focus Media's Allyes subsidiary. *Id.* Plaintiff also alleged that Defendants materially overstated the number of flat-panel displays in the Company's LCD Display Network throughout the relevant time period. *Id.*

On April 11, 2014, the Company filed a motion to dismiss the Amended Complaint. D.E. 23. The parties thereafter agreed to engage in mediation in an effort to resolve the Action. MacFall Decl. ¶ 14. On April 28, 2014, a mediation session was conducted before Jed D. Melnick, Esq. of JAMS. *Id.* ¶ 15. In addition to counsel for the parties, a representative of Focus Media's insurance carrier attended that mediation session. *Id.* Following a full day session, the mediation ended with no agreement between the parties. *Id.* ¶ 16. Additional negotiations were conducted telephonically through Mr. Melnick. *Id.* On April 29, 2014, Mr. Melnick made a mediator's proposal, which was subsequently accepted by the parties. *Id.*

The parties memorialized and presented this Settlement to the Court in the form of the Stipulation of Settlement ("Stipulation"), which provides that Focus Media will pay the Settlement Amount in cash into an interest bearing escrow account for the benefit of the Class. D.E. 29. The

Class, as defined in the Stipulation, includes all persons who purchased or otherwise acquired Focus Media ADSs from November 20, 2007 through November 21, 2011 and who were damaged thereby.[3]

On May 13, 2014, Plaintiff filed an unopposed motion for preliminary approval of Settlement. D.E. 30. This Court entered an Order Preliminarily Approving Settlement and Providing for Notice of Proposed Settlement, dated May 19, 2014 (D.E. 34), and amended on May 23, 2014 (D.E. 36) (the "Preliminary Order"), preliminarily certifying the class (the "Class" or "Settlement Class"), consisting of "all Persons who purchased or otherwise acquired ADSs of Focus Media between November 20, 2007 and November 21, 2011, inclusive, excluding (i) those Persons who timely and validly request exclusion from the Settlement Class; and (ii) the Defendants and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries and/or assigns of any such individual or entity in their capacity as such . . . ." *Id.* ¶ 2. The Court also approved the form and content of the Notice, Proof of Claim and Summary Notice. *Id.* ¶ 7.

On May 28, 2014, Focus Media deposited $3.7 million into an interest bearing escrow account for the benefit of the Class. MacFall Decl. ¶ 19. Also, on May 28, 2014, Focus Media served notice on the attorneys general for the United States, District of Columbia and all 50 states pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 *et seq.*

The Court-appointed Claims Administrator, A.B. Data, was responsible for implementing

---

[3] This definition differs from that found in the Amended Complaint to avoid the possibility of a double recovery for Class members who received a distribution and executed a release in connection with, or whose claims were released by, the settlement in *In re Focus Media Holding Limited Litigation*, No. 07 Civ. 10617 (LTS)(GWG) (S.D.N.Y.). The prior litigation released claims for the period of September 27, 2007 through November 19, 2007, inclusive. *See In re Focus Media Holding Limited Litig.*, No. 07 Civ. 10617 (LTS)(GWG) (S.D.N.Y.) D.E. 45, ¶¶ 1.5, 1.18 and D.E. 62.

4

the Court-approved notice program. MacFall Decl. Ex. C ("Verkhovskaya Decl."). Focus Media provided record holder data from its ADS transfer agent, Citibank, and requested that the Depository Trust Company ("DTC") provide the Claims Administrator with certain further record holder information. MacFall Decl. ¶ 20. DTC provided the Claims Administrator with a list of 799 names and addresses of Focus Media record holders ("Record Holder Mailing List"), which the Claims Administrator used to contact potential Authorized Claimants. *Id.* ¶¶ 7-9; MacFall Decl. ¶ 20.

As of June 2, 2014, the Claims Administrator caused a copy of the court-approved Notice and the Proof of Claim ("Notice Packets"), to be mailed to the persons and entities on the Record Holder Mailing List via USPS First-Class Mail. Verkhovskaya Decl. ¶ 9. An additional 151,931 Notice Packets were delivered to and/or sent on behalf of banks, brokers, and other nominees. *Id.* ¶ 10. The Claims Administrator also: (1) established a toll-free number with an IVR system and live operators, fielding calls from June 2, 2014 through August 11, 2014 (*id.* ¶¶ 12, 13); (2) established a page on its website and a case-specific website for the case, including downloadable documents including, among other forms, Notice, Claim Form, Summary Notice, Order, Stipulation of Settlement (*id.* ¶ 14); and, (3) caused the Summary Notice to be published in *Investor's Business Daily* on, June 9, 2014 and the press release of the Summary Notice to be transmitted over *PR Newswire* on June 9, 2014 (*id.* ¶¶ 15, 16). As of August 11, 2014, three Class members opted out of the Settlement[4] and two Class members lodged objections. *Id.* ¶ 17, 18.

---

[4] As indicated in the Notice, each person requesting exclusion was required to provide the dates and amounts of each ADS purchase and sale transaction and the number of ADSs held as of November 21, 2011. Each Person was also obligated to supply proof purchase/sale and membership in the Settlement Class. Verkhovskaya Decl. Ex. A, at 7. None of the parties purportedly seeking exclusion provided any information or documentation to identify themselves as members of the Class. *Id.*, Ex. F. Since it is impossible to determine if these parties are class members, the exclusion requests are invalid.

## DISCUSSION

## I.   STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS

"The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation." *In re Advanced Battery Techs. Secs. Litig.*, No. 11 Civ. 2279 (CM), 298 F.R.D. 171, 2014 U.S. Dist. LEXIS 39575, at *6-7 (S.D.N.Y. Mar. 24, 2014).  Thus, when exercising discretion to approve a settlement, courts are "mindful of 'the strong judicial policy in favor of settlements.'" *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re Paine Webber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *accord In re Telik Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).

"Due to the presumption in favor of settlement, '[a]bsent fraud or collusion, courts should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.'" *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *6-7 (citing *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ 10240 (CM), 2007 Dist. LEXIS 57918, at *12 (S.D.N.Y. July 27, 2007)).  As this Court explained: "the Court must engage in a careful balancing act: 'The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 424 (S.D.N.Y. 2001) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 48 (2d Cir. 2000)).  Courts must refrain from "'decid[ing] the merits of the case or resolv[ing] unsettled legal questions.'" *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *7-8 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)).

Federal Rule of Civil Procedure 23(e) requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate. FED. R. CIV. P. 23(e). In practice, courts apply this rule by generally approving a settlement that is "fair, adequate, and reasonable, and not the product of collusion." *Wal-Mart*, 396 F.3d at 116 (internal quotation omitted).

To determine procedural fairness, courts examine the negotiating process leading to the settlement. *Id.*; *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). A class action settlement enjoys a "presumption of correctness" where it is the product of arm's length negotiations conducted by experienced, capable counsel. *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (citing *Wellman v. Dickinson*, 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 647 F.2d 163 (2d Cir. 1981)); *accord In re Global Crossing Sec. & Erisa Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004); *see also EVCI*, 2007 U.S. Dist. LEXIS 57918, at *11 (A settlement that is "the product of arm's length negotiations conducted by capable counsel, well experienced in class action litigation arising under the federal securities laws," will "enjoy[] a strong presumption that it is fair, reasonable and adequate."); *accord Wal-Mart*, 396 F.3d at 116.

With respect to substantive fairness, the standards governing approval are well established. Courts in this Circuit determine whether a class action settlement's terms are fair, adequate, and reasonable according to the "*Grinnell* factors:"

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463).

"In finding that a settlement is fair, reasonable and adequate, not every factor must weigh in favor of the settlement." *Telik*, 576 F. Supp. 2d at 575. Rather, "the court should consider the totality of these factors in light of the particular circumstances." *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) (citing *D'Amato*, 236 F.3d at 86). "Moreover, in applying these factors, the court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a 'mini-trial' of the merits of the action." *Telik*, 576 F. Supp. 2d at 575-76 (citing *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) and *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 U.S. Dist. LEXIS 22992 (S.D.N.Y. Nov. 12, 2004)).

## II. THE PROPOSED SETTLEMENT IS PROCEDURALLY AND SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE

### A. The Settlement Is Entitled To A Strong Presumption Of Fairness

As noted above, a strong presumption of fairness attaches to a class action settlement where, as here, it is reached in arm's length negotiations among able counsel. *See Wal-Mart*, 296 F.3d at 116. "Moreover, 'great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.'" *Telik*, 576 F. Supp. 2d at 576 (citing *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002)).

In this case, the parties chose to engage in mediation subsequent to the filing of Plaintiff's Amended Complaint and Focus Media's motion to dismiss but prior to discovery. MacFall Decl. ¶ 14. Lead Counsel had some opportunity to obtain an understanding of the strengths and weaknesses of the claims through its investigation and assessment of the opening brief in support of Focus Media's motion to dismiss. Of greater importance in a case that settles prior to discovery, the parties submitted extensive written submissions in connection with the mediation, which

8

expanded their respective theories of the case.

This Settlement is the product of extensive and robust arm's length negotiations that occurred during and after an in-person mediation session before Jed D. Melnick, Esq. on April 28, 2014. MacFall Decl. ¶ 15. Counsel for Plaintiff and Focus Media, as well as a representative of the Company's insurance carrier attended that mediation session. *Id.* Although the formal mediation was unsuccessful, the parties continued to engage in negotiations through Mr. Melnick, who – as a result of the written submissions discussed above – was able to make an independent assessment of the value of the case. This culminated in a "doubleblind" mediator's proposal on April 29, 2014, which both parties accepted the next day. *Id.* ¶ 16.

Mr. Melnick's role in the settlement negotiations overcomes any hesitation this court might have about approving a settlement reached prior to any discovery. According to his published JAMS biography, Mr. Melnick "has mediated over 750 disputes, published articles on mediation, founded a nationally ranked dispute resolution journal and taught young mediators." Jed D. Melnick, Esq. – JAMS, www.jamsadr.com/melnick/ (last visited July 15, 2014). He also has specific experience in the area of Chinese securities litigation and assisted the Hon. Daniel Weinstein (Ret.) in the successful mediation that led to the settlement approved by this Court in the action *In re Telik, Inc. Securities Litigation*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008). *Id.* The participation of this highly qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion. *See, e.g., Telik*, 576 F. Supp. 2d at 576); *In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005).

Further, all parties were represented throughout the Settlement negotiations by counsel who are experienced in class action and securities litigation, which also militates in favor of

9

approving the Settlement.[5]  *Telik*, 576 F. Supp. 2d at 576-577

The Court therefore accords a strong presumption of fairness to the Settlement in considering the substantive *Grinnell* factors discussed below.

**B.      The Settlement Is Substantively Fair, Adequate And Reasonable**

**1.      Continued Litigation Would be Complex, Protracted and Consume Substantial Judicial and Private Resources**

Without a settlement, the anticipated complexity, cost and duration of continued litigation in this action would be considerable.  Plaintiff asserts claims pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, based upon Defendants' alleged material false and misleading statements concerning certain of its acquisitions, certain transactions between the Company's insiders and its subsidiaries, and the Company's reporting of operation data.  These claims relate to events throughout the Company's eight year listing on NASDAQ.  These claims involve sharply disputed legal issues as evidenced by the numerous defenses raised in Focus Media's motion to dismiss.  *See, e.g.*, *City of Providence v. Aéropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517, at *14 (S.D.N.Y. May 9, 2014); *In re Bear Stearns Cos. Inc. Sec., Deriv. & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).

Regardless of the ultimate outcome, there is no question that further litigation will be complex, expensive and protracted. In securities class actions, such as this, courts consistently recognize "that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement." *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575,

---

[5] Lead Counsel are highly experienced in prosecuting securities law claims and shareholder class actions as set forth in the Firm résumé attached as Exhibit B to the MacFall Declaration.  Simpson Thacher, counsel for Focus Media, has an internationally recognized securities litigation practice and decades of experience in complex securities litigation.

at *10; *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 17588, at *31 (S.D.N.Y. Apr. 6, 2006) I*n re Alloy, Inc. Sec. Litig.*, No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129, at *5 (S.D.N.Y. Dec. 2, 2004). The duration and cost of further litigation weighs in favor of the Settlement.

With respect to discovery generally, given the complexities of the issues involved in this action, tens-if not hundreds-of-thousands of pages of documents would need to be reviewed and numerous depositions taken. The cost alone would likely significantly erode, or exhaust, the only readily available source of funding for a recovery – the Company's D&O insurance policy.[6] Moreover, the court is mindful of the fact that, because Focus Media is headquartered in the People's Republic of China, litigation faces many other obstacles, such as the lack of subpoena power to compel the appearance of fact witnesses. *See In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007, at *12 (S.D.N.Y. May 13, 2011); *see also Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 363 (S.D.N.Y. 1988). It can be difficult and sometimes impossible to obtain evidence from China because of its very different regulatory regime governing access to documents and witnesses. *See Jacques Delisle and Elizabeth Trujillo, Consumer Protection in Transnational Contexts*, 58 Am. J. Comp. L. 135, 161 (2010) ("Discovery in China for litigation in the United States faces formidable barriers[.]"); Zhong Jianhua and Yu Guanghua, *Establishing the Truth on Facts: Has the Chinese Civil Process Achieved this Goal?*, 13 J. Transnat'l L. & Pol'y 393, 409 (2004) ("Strictly speaking, there is no system comparable to discovery in China.").[7]

---

[6] Focus Media maintained a $10 million Directors & Officers Liability and Company Reimbursement Insurance Policy (the "D&O Policy") that is applicable to Plaintiff's claims. MacFall Decl. ¶ 15.

[7] This is not the first case in which this Court has had to address the settlement of a class action in light of the difficulties of taking meaningful discovery of Chinese corporations that are permitted to issue ADSs and ADRs in the United States. While it is fair to expect investors to maintain a "caveat emptor" attitude

11

While denying liability, Focus Media considered its risk and options and agreed to settle now, thereby avoiding further litigation and a trial. Plaintiff and Lead Counsel have also considered the risk and their options and concluded that this Settlement provides the Class with a fair recovery in light of the anticipated delay and expense of trial and post-trial proceedings.

**2.     The Reaction of the Class Has Been Overwhelmingly Positive**

The reaction of the Class to the Settlement strongly supports final approval. The Notice Packet has been mailed to 799 potential Class Members, with an additional 151,931 Notice Packets delivered to and/or sent on behalf of banks, brokers, and other nominees. Verkhovskaya Decl. ¶¶ 7, 9, 10. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire*. Verkhovskaya Decl. ¶¶ 15, 16. The time for filing objections to the Settlement, Plan of Allocation or Lead Counsel's application for attorneys' fees and expenses expired on July 17, 2014. MacFall Decl. ¶ 22. As of that date, Lead Counsel had received only 2 objections to the Settlement. Verkhovskaya Decl. ¶ 17. A small number of objections may "be viewed as indicative of the adequacy of the settlement." *Wal-Mart*, 396 F.3d at 118 (citations omitted). Furthermore, these objections are targeted at the Plan of Allocation – not the amount of the Settlement. Moreover, both lack merit (*see infra* Section III). *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *13.

**3.     Plaintiff Has Sufficient Information to Make Informed Decisions as to Settlement of This Case**

Although this matter is at a relatively early stage in the proceedings, Plaintiff has conducted due diligence and discovery to properly evaluate the case and assess the adequacy of the

---

when investing in such enterprises, the fact that this issue comes up over and over again in shareholder litigation suggests that the SEC might wish to consider whether it is appropriate to permit these effectively non-regulatable corporations to have access to our regulated securities markets in order to raise capital. Such policy issues are of course beyond the purview of this or any court.

Settlement. To date, Lead Counsel has investigated the claims, filed an initial complaint and the Amended Complaint, filed a motion to appoint lead plaintiff and counsel, reviewed and considered Defendant's motion to dismiss, as well as Defendant's extensive mediation submission.  MacFall Decl. ¶ 23.  The parties agreed to stay Plaintiff's briefing on the motion to dismiss pending the outcome of the mediation; however, Plaintiff evaluated its defenses to that motion when drafting its mediation statement and preparing to file his opposition to that motion.  *Id.* ¶ 27.

While formal discovery has not yet begun, formal discovery is not a prerequisite to settlement; the question is whether the parties had adequate information about their claims.  *Global Crossing*, 225 F.R.D. at 458.  As part of a brief confirmatory discovery process following the mediation, Defendant provided Plaintiff with hundreds of pages of documents critical to the assessment of Plaintiff's claims, including independent third-party reports relating to the fair market value of Allyes, which were used in connection with the management buyout of 38% of that Focus Media subsidiary.  *Id.* ¶ 23.  Plaintiff also gained an understanding of what monies were available to fund any potential recovery through Focus Media's insurer, which sent a representative to the mediation.  *Id.* ¶ 15.  *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *17  Thus, Plaintiff and Lead Counsel have some knowledge of the strengths and weaknesses of Plaintiff's claims and considerable knowledge about the limits on their ability to recover anything for the Class if they win—both of which support the Settlement.

### 4.    Establishing Liability and Damages Involves Significant Risks

In considering whether to enter into the Settlement, Plaintiff, represented by counsel experienced in securities litigation, took into account the risks inherent in establishing Defendants' liability.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (proof that material misstatements caused plaintiffs' losses is a required element of a Rule 10b-5 claim) (citing 15

13

U.S.C. § 78u-4(b)(4)). Those risks, which would result in the Class receiving nothing, strongly militate in favor of approving the Settlement. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 U.S. Dist. LEXIS 93423, at *27-28 (S.D.N.Y. Dec. 20, 2007); *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 CPS, 2007 U.S. Dist. LEXIS 29062, at *37-40 (E.D.N.Y. Apr. 19, 2007; *Taft v. Ackermans*, No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144, at *19-22 (S.D.N.Y. Jan. 31, 2007); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239, at *3 (S.D.N.Y. May 15, 2003).

Here, Focus Media argued in its Motion to Dismiss (D.E. Nos. 23-25) that the Company adequately disclosed all material facts concerning management's purchase and subsequent sale of an interest in Focus Media's Allyes subsidiary. With respect to the allegations concerning Focus Media's inflated LCD display count, the Company argued that the alleged misstatements were not material because they had no effect on Focus Media's financial results. Focus Media also asserted that Plaintiff failed to adequately allege *scienter* because Plaintiff purportedly pleaded no facts to establish that any Company insider had a motive to commit fraud, and no other facts demonstrating that the Company intentionally or recklessly issued the challenged statements. While Plaintiff believes that he could have overcome this challenge and satisfied his pleading burden, he also recognizes that ultimate success is far from certain. If the case were to proceed, Focus Media would have raised additional defenses and arguments on summary judgment, class certification, and trial.

### 5. The Settlement Amount is Reasonable in View of the Best Possible Recovery and the Risks of Litigation

Carefully evaluating the merits of this case and the proposed Settlement, Lead Counsel, who have considerable experience in the prosecution and resolution of complex securities and class action litigation, determined that it is fair and reasonable to the Class. MacFall Decl. ¶ 30.

The Settlement warrants final approval because it allows Settlement Class Members to recover part of their losses now without the risk of a loss on the merits. The recovery represents 37% of the available D&O Policy, which – as far as anyone knows – is all the money that is available to find a judgment. *Id.* ¶ 19. The Settlement avoids the risk that further litigation would have resulted in a lesser recovery even if Plaintiff prevailed on the merits because defense costs would have significantly depleted, if not exhausted, the available D&O Policy. *Id.* ¶ 28; *see, e.g., Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *23 ("settlement amount is sufficient when limited insurance coverage, minimal domestic assets, and significant risk of being unable to collect any judgment against . . . Defendants are taken into account.") (citing *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1414 (D. Minn. 1987) ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (internal quotations and citations omitted)); *see also Global Crossing*, 225 F.R.D. at 461 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (citation omitted).

Moreover, the proposed Settlement provides the certainty of a present recovery for the shareholders against foreign defendants who would be, for all practical purposes, immune from a judgment entered by a court in the United States.[8] *See, e.g., Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at *23. Generally, settlements with Chinese issuers have proven to be considerably lower than typical securities settlements against U.S. Companies because they are effectively

---

[8] An asset search conducted by Plaintiff revealed that none of the Individual Defendants maintained assets in the United States. MacFall Decl. ¶ 28. Again, I express some consternation that the appropriate regulators allow foreign corporations access to securities markets when everyone knows that those corporations have no incentive to comply with U.S. securities laws, because they cannot be compelled either to cooperate with our litigation processes or to fund any judgment that might be entered against them in an American court.

uncollectable—garnering the label "China discount." Jessica Seah, *Decline in Securities Litigation Against U.S.-listed Chinese Companies*, The Asian Lawyer (Jan. 30, 2013) (Exhibit 2 hereto).[9]

Under these circumstances, the Settlement is within the range of reasonable class action settlements against similarly situated defendants and warrants approval by this Court.

### 6.   Defendant's Ability to Withstand a Greater Judgment

Whether Defendant could withstand a greater judgment had little bearing on settlement negotiations, as the only funding readily available for collection of any potential judgment in the United States is the $10 million D&O Policy. Thus, this factor held little significance in light of Plaintiff's prevailing concern with enforcing and collecting a favorable judgment if one could be obtained. *AMF Bowling*, 334 F. Supp. 2d at 467 (finding this factor "of little significance in light of all other factors"). Courts have found that "this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied." *Telik*, 576 F. Supp. 2d 570, 580 (citing *Meijer, Inc. v. 3M*, Civ. No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *55 (E.D. Pa. Aug. 15, 2006) and *D'Amato*, 236 F.3d at 86 (2d Cir. 2001)).

### III.   THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND IS FAIR AND REASONABLE

"All aspects of settlement approval, including, but not limited to, the Plan of Allocation, rest in the sound discretion of the district court." *Am. Bank*, 127 F. Supp. 2d at 429 (citations

---

[9] For example, in 2013, of the fourteen securities class actions against Chinese issuers that were settled, "[a]ll but one" settled for an "amount[] less than $10 million." Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, *Cornerstone Research, Securities Class Action Settlements: 2013 Review and Analysis*, at 2 (Mar. 27, 2014) (Exhibit 1 hereto). There were also three China-related securities litigation settlements in 2012 for $600,000, $2 million, and $3 million. Seah, *supra*. The Settlement Amount here falls within the range of settlements with other Chinese issuers.

omitted). "When evaluating the fairness of a Plan of Allocation, courts give weight to the opinion of qualified counsel." *Advanced Battery*, 2014 U.S. Dist. LEXIS 39575, at \*26. A Plan of Allocation "need have only a reasonable, rational basis" where it is "formulated by competent and experienced class counsel." *Global Crossing*, 225 F.R.D. at 462 (quotation omitted); *Am. Bank*, 127 F. Supp. 2d at 429-30 (same).

The Plan of Allocation ("Plan") provides that the Net Settlement Fund will be distributed to Authorized Claimants, *i.e.*, members of the Class who submit timely and valid Proofs of Claim. D.E. 29-2 at A1-17-22. The Plan treats all Class Members in a similar manner: everyone who submits a valid and timely Proof of Claim, and does not exclude himself or herself from the Class, receives a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's Recognized Claim bears to the total of all Recognized Claims. *Id.*

For losses to be compensable damages under the federal securities laws, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of the security. *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2nd Cir. 1992) ("To establish loss causation a plaintiff must show, that the economic harm that it suffered occurred as a result of the alleged misrepresentations."). In this case, Plaintiff alleges that Defendants issued false statements and omitted material facts, from November 20, 2007, through November 20, 2011, that inflated the price of Focus Media ADSs. D.E. 22. Plaintiff also alleges that corrective information, on November 21, 2011, impacted the market price of Focus Media ADSs in a statistically significant manner and removed the alleged artificial inflation from the stock price on that day. *Id.* Accordingly, in order to have a compensable loss, Authorized Claimants must have purchased or otherwise acquired Focus Media ADSs during the Settlement Class Period and held until the release of the corrective information. D.E. 29-2 at A1-18.

17

The Plan accounts for circumstances where Authorized Claimants held Focus Media ADSs prior to November 20, 2007 and sold those ADSs before November 20, 2011 and, thus, would have gained from the alleged artificial inflation in the ADSs attributable to the alleged misrepresented information. *Id.* at A1-21. For each of the aforementioned ADSs, "the Recognized Gain amount shall be $7.29." *Id.* In order to calculate the Authorized Claimants' Recognized Claim, the Plan requires that the Recognized Gain Amount (*i.e.*, $7.29 per ADS) be netted against the Recognized Loss Amounts. *Id.*

This Plan reflects Plaintiff's damages expert's analysis undertaken to that end, including a review of publicly available information regarding Focus Media, and a statistical analysis of the price movements of Focus Media ADSs and the price performance of relevant market and peer indices during the Settlement Class Period. D.E. 29-2 at A1-17. The calculations, made pursuant to the Plan, weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund. *Id.* The "Recognized Claim," as used in the Plan of Allocation, is not market loss. Rather, the Plan of Allocation ensures an equitable *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants based solely on when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during the Class Period. "Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." *Global Crossing*, 225 F.R.D. at 462 (citation omitted). Plaintiff, thus, submits that the Plan is fair and reasonable and should be approved.

The first objection to the Plan is by Ms. Kathy Cohen. Ms. Cohen objects that, "It is not true that Pre-Class members recognized gains" from the alleged artificial inflation in the ADSs attributable to the alleged misrepresentations by selling their ADSs between November 20, 2007 and November 20, 2011 (*i.e.*, $7.29 per ADS). Verkhovskaya Decl., Ex. E. She asks that the Plan

18

of Allocation "be amended to allow Pre-Class members to net actual losses for sale between November 20, 2007 and November 20, 2011 against Class Members' total Recognized Loss Amounts to determine a Claimant's Recognized Claim." *Id.*

Ms. Cohen's objection lacks merit. She misunderstands the difference between losses due to general market and industry movements as opposed to losses due to the removal of artificial inflation by correcting material misinformation. Ms. Cohen claims to have purchased 1000 ADSs in March, 2008[10] and sold 500 of those ADSs in November, 2008 at a loss, prior to the release of corrective information on November 21, 2011. But since she sold the 500 ADSs before the corrective information was provided to the market, she sold them at an inflated price – even though she lost money. Thus, the significant loss (exceeding $7.29 per ADS) that she experienced was not due to Defendants' alleged wrongdoing, but rather, to other market forces.

The second objection, by Mr. Shankara Raghuraman, is similarly flawed. He seeks to participate in the Settlement but sold his shares at an inflated price on July 15, 2010. *Id.* The Court will not disapprove or modify the Plan.

## IV.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23

To certify a settlement class, the Court must determine whether four threshold requirements of Federal Rule of Civil Procedure 23(a) ("Rule 23(a)") are met including (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation. *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997). The action must also be maintainable under Federal Rule of Civil Procedure 23(b)(1), (2), or (3). ("Rule 23(b)"). Here, the proposed Settlement Class meets all the requirements of Rule 23(a) and Rule 23(b)(3).

---

[10] Ms. Cohen also purchased 1000 ADSs on November 14, 2007, prior to the time that the price of the ADSs was artificially inflated by Defendants' alleged material misrepresentations. *Id.*

19

### A.    The Numerosity Requirement Is Satisfied

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993). Here, throughout the Class Period, there were millions of ADSs traded in the United States. Beneficial holders of the ADSs are believed to number in the thousands and are geographically located throughout the United States and abroad, making joinder impracticable. Thus, Rule 23(a)(1) is satisfied. *See In re Penthouse Exec. Club Comp. Litig.*, No. 10 Civ. 1145 (KMW), 2013 U.S. Dist. LEXIS 63065, at *12 (S.D.N.Y. Apr. 30, 2013).

### B.    Plaintiff And The Class Share Common Questions Of Law And Fact

The commonality requirement of Rule 23(a)(2) and typicality requirement of Rule 23(a)(3) are discussed herein together because courts treat them as closely linked and evaluate them on much the same basis. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 311 (3d Cir. 1998) ("The concepts of commonality and typicality are broadly defined and tend to merge."). The threshold for satisfying these two requirements is not high. *McManus v. Fleetwood Enters.*, 320 F.3d 545, 548 n.2 (5th Cir. 2003). The commonality inquiry "asks if the named plaintiffs' 'grievances share a common question of law or of fact' with those of the proposed class . . . ." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). Typicality is satisfied if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (citation omitted); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97,

20

104 (S.D.N.Y. 1999).

The Complaint asserts the same claims on behalf of all Class Members. All Class Members purchased ADSs during the Class Period and allegedly sustained injury due to the artificial inflation of the price of those securities that was caused by Defendants' alleged material misrepresentations throughout the Class Period. In addition, all Class Members assert the same legal claims under the federal securities laws. Plaintiff has alleged common issues of fact and law that affect all Class Members, satisfying the commonality requirement of Rule 23(a)(2). *See, e.g., Sumitomo*, 189 F.R.D. at 279 "Even a single common legal or factual question will suffice" to satisfy the commonality requirement as to a particular claim. *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (citation omitted).

## C.    Plaintiff And Lead Counsel Will Adequately Represent The Proposed Class

The adequacy requirement of Rule 23(a)(4) involves the inquiry as to whether: (1) Plaintiff's interests are antagonistic to the interests of the other members of the Class; and (2) Plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both elements are present in this case.

No conflicts exist between Plaintiff and the members of the Class. Plaintiff's interests are aligned with those of the Class because the factual and legal claims of Plaintiff and the Class arise from the same nexus of operative facts and course of conduct by Defendants. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625-26 (citation omitted); *Penthouse*, 2013 U.S. Dist. LEXIS 63065, at *13. Plaintiff, like all Class Members, purchased Focus Media ADSs at artificially inflated prices during the Class Period as a result of Defendants' alleged materially

21

false and misleading statements and was damaged thereby. Plaintiff has retained counsel who has successfully prosecuted numerous securities and other complex class actions in courts throughout the United States. *See* MacFall Decl. Ex. B. Lead Counsel has vigorously prosecuted the Action. Thus, Plaintiff is an adequate representative of the Class, and Lead Counsel is qualified, experienced, and capable of prosecuting the Action, in satisfaction of Rule 23(a)(4).

**D.     The Proposed Class Satisfies The Requirements Of Rule 23(b)(3)**

In addition to the four requirements of Rule 23(a), a class must also satisfy one of the three subparts of Rule 23(b). Plaintiff seeks class certification under Rule 23(b)(3), which requires that:

> the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FED. R. CIV. P. 23(b)(3). This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

**1.     Common Questions of Law and Fact Predominate**

The Rule 23(b)(3) inquiry normally focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Cromer*, 205 F.R.D. at 127 (quoting *Amchem*, 521 U.S. at 623) (alteration in original). Predominance "is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem*, 521 U.S. at 625. Because the issue of liability in this case is common to all members of the Class, the predominance requirement of Rule 23(b)(3) is satisfied. Plaintiff alleges that Defendants engaged in a common course of fraudulent conduct causing the artificial inflation of the price of Focus Media ADSs. Proof of that common course of conduct relates to Defendants' liability as to all Class Members. Because the

22

central and predominant focus of the action is Defendants' alleged fraudulent conduct, each Class Member is similarly situated and common questions predominate over individual questions. *See Cromer*, 205 F.R.D. at 127; *Blech*, 187 F.R.D. at 107.

In this case, common questions predominate over individual questions. The common questions include: (1) whether the federal securities laws were violated by Defendants' acts and omissions; (2) whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about the business and operations of Focus Media; (3) whether the market price of Focus Media ADSs was artificially inflated during the Class Period due to the material misrepresentations and omissions; and (4) to what extent the members of the Settlement Class have sustained damages and the proper measure of damages.

## 2.    A Class Action is Superior to Multiple Individual Actions

Rule 23(b)(3) also requires that the class action be "superior to other available methods for fair and efficient adjudication of the litigation." FED. R. CIV. P. 23(b)(3). Courts have found that the superiority requirement is satisfied where:

> The potential class members are both significant in number and geographically dispersed. The interest of the class as a whole in litigating the many common questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions.

*Cromer*, 205 F.R.D. at 133.

Here, the utility of presenting the claims asserted through the class action method is substantial since the Class Members who have been injured number in the thousands, but most have not been damaged to a degree that would induce them to institute litigation on their own behalf. *See Blech*, 187 F.R.D. at 107 ("violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible");

23

*see also Sumitomo*, 189 F.R.D. at 279.

Further, certification of the Class is the superior method to facilitate the resolution of Plaintiff's claims. Without the settlement class device, Defendant could not obtain a Class-wide release, and therefore would have had little, if any, incentive to enter into the Settlement. Moreover, certification of a class for settlement purposes will enable Lead Counsel to handle the administration of the Settlement in an organized and efficient manner. Resolution of Plaintiff's claims against Defendant through the proposed Class is superior to any other available method of resolution.

## V.   THE COURT AWARDS ATTORNEYS' FEES IN MODIFIED AMOUNT

Federal Rule of Civil Procedure 23(h) provides in relevant part that, in connection with this Class certification and Settlement, the Court "may award reasonable attorney's fees and nontaxable costs that are authorized by law." FED. R. CIV. P. 23(h); *see also* FED. R. CIV. P. 23 advisory committee's note (clarifying applicability of subdivision (h) where, as here, there is "a simultaneous proposal for class certification and settlement"). The PSLRA provides that class counsel are entitled to attorneys' fees representing a "reasonable percentage" of the damages paid to class members. *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) (quoting 15 U.S.C. § 78u-4(a)(6)) (emphasis removed). Such an award is appropriate where, as here, Lead Counsel has created a common fund in the amount of $3.7 million to be shared by the Class.

### A.   The Percentage Of Recovery Methodology Is The Most Efficient And Logical Means For Calculating Counsel's Fees

Pursuant to the "'equitable' or 'common fund' doctrine established more than a century ago" in *Trustees v. Greenough*, 105 U.S. 527, 532-33 (1882), "attorneys who create a common

24

fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work." *Am. Bank*, 127 F. Supp. 2d at 430; *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *43 (S.D.N.Y. July 27, 2007), (quoting *Boeing Co. v. Van Gernert*, 444 U.S. 472, 478 (1980)). Fees and expenses are paid from the common fund so that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *Am. Bank*, 127 F. Supp. 2d at 430; *accord City of Providence v. Aéropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517, at *30 (S.D.N.Y. May 9, 2014).

In *Goldberger*, the Second Circuit identified a "need for fee awards to be fair and reasonable, and described two forms of fee calculation methodologies—the first used as a check for reasonableness, the latter serving as the preferred method." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008). "The first is the 'lodestar' method, where 'the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate.'" *Id.* (citing *Goldberger*, 209 F.3d at 47). "Once the lodestar is calculated, the court may, in its discretion, increase the lodestar by applying a multiplier based on other less objective factors, such as the risk of the litigation and the performance of the attorneys." *Id.* (citing *Goldberger*, 209 F.3d at 47) (internal quotations omitted).

The second method utilized by district courts for calculating fees is the "percentage of recovery." *Goldberger*, 209 F.3d at 47. "In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.* at 47 (citation omitted). The percentage of recovery approach, however, is "simpler"

25

than the lodestar approach because it does not require courts to "exhaustively scrutinize[]" attorneys' time records. *Id.* at 50; *see also id.* at 48-49.

Recognizing the advantages of the percentage of recovery methodology, the *Goldberger* Court reaffirmed the Second Circuit's view that it is an accepted means for calculating attorneys' fees in class actions.[11]  *Id.* at 49 ("the percentage-of-the-fund method is a viable alternative") (quoting *Savoie v. Merch. Bank*, 166 F.3d 456, 460 (2d Cir. 1999)).  The court held that as long as utilizing the percentage of recovery methodology does not produce an "unwarranted windfall[]" to counsel, there is "no need to compel district courts to undertake the 'cumbersome, enervating, and often surrealistic process' of lodestar computation." *Goldberger*, 209 F.3d at 49-50 (quoting *Savoie*, 166 F.3d at 461 n.4).  The court also decided: (a) not to prohibit district courts from calculating attorneys' fees utilizing a lodestar approach (as some Courts of Appeal had done); and (b) to "encourage" the analysis of counsel's lodestar "as a 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50 (citation omitted).

As evidenced by this Circuit's opinions since *Goldberger*, there is a distinct trend among the Second Circuit district courts to award fees using the percentage method.  *City of Providence*, 2014 U.S. Dist. LEXIS 64517, at \*32; *see also In re Beacon Assocs.*, 2013 U.S. Dist. LEXIS 82192, at \*44 (S.D.N.Y. May 9, 2013) ("the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, reserving the traditional 'lodestar' calculation as a method of testing the fairness of a proposed settlement") (citations omitted); *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2012 U.S. Dist. LEXIS 108516, at \*17 (S.D.N.Y. Aug. 1, 2012) ("'the percentage method

---

[11] Courts have also recognized that, "The percentage method is attractive because it directly aligns the interests of the Class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *Am. Bank*, 127 F. Supp. 2d at 431-32; *Telik*, 576 F. Supp. 2d at 586 n.5.

continues to be the trend of district courts in th[e Second] Circuit'") (citation omitted); *accord In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85554, at *10 (S.D.N.Y. Nov. 7, 2007); *Hicks v. Morgan Stanley*, No. 01-cv-10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *22-23 (S.D.N.Y. Oct. 24, 2005).

The Second Circuit's adoption of the percentage of recovery methodology is consistent with national precedent. *See, e.g., Telik*, 576 F. Supp. 2d at 586 & n.7 (citing *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002); *Am. Bank*, 127 F. Supp. 2d at 430. It is also consistent with the PSLRA, which expressly provides that class counsel are entitled to attorneys' fees that represent a "reasonable percentage" of the damages recovered by the class. *Telik*, 576 F. Supp. 2d at 586 (citing 15 U.S.C. § 78u-4(a)(6)). "Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions." *Telik*, 576 F. Supp. 2d at 586 (citing *Am. Bank*, 127 F. Supp. 2d at 430).

## B.     The Requested Attorneys' Fees Are Not Reasonable Under Either The Percentage Of The Fund Or The Lodestar/Multiplier Method

Lead Counsel requests a fee award of 25% of the Settlement Fund, which represents a 3.99 lodestar multiple. That is not a reasonable request.

On a percentage basis, the amount of attorneys' fees requested is certainly within the range of attorneys' fees awards made by courts in this District and other courts within the Second Circuit. *See, e.g., City of Providence*, 2014 U.S. Dist. LEXIS 64517, at *60 (awarding fees in the amount of $4,950,000, or 33% of the settlement fund); *Beacon*, 2013 U.S. Dist. LEXIS 82192, at *44 ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund."); *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194 (SAS), 2011 U.S. Dist. LEXIS 17747, at *12 (S.D.N.Y. Feb. 23, 2011) (awarding 33.3% of $6.75 million settlement); *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS

27

53007 (S.D.N.Y. May 13, 2011) (awarding attorneys' fees of 33 1/3% of the $1,050,000 settlement fund); *Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945, at \*59-60 (S.D.N.Y. Nov. 30, 2010) (collecting cases supporting the proposition that "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater); *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 U.S. Dist. LEXIS 27899, at \*16-17 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding attorneys' fees over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Veeco*, 2007 U.S. Dist. LEXIS 85554, at \*39 (awarding 30% of $5.5 million settlement fund); *Hicks*, 2005 U.S. Dist. LEXIS 24890, at \*30 (awarding 30% of $10 million settlement, plus expenditures); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2003 U.S. Dist. LEXIS 8239, at \*6 (S.D.N.Y. May 15, 2003) (awarding 33 1/3% of $975,000 settlement plus reimbursement of expenses); *Maley*, 186 F. Supp. 2d at 368 (awarding 33 1/3% of $11.5 million settlement); *Adair v. Bristol Tech. Sys., Inc.*, No. 97 Civ. 5874 (RWS), 1999 U.S. Dist. LEXIS 17627, at \*8-10 (S.D.N.Y. Nov. 16, 1999) (awarding requested counsel fee of 33% of the $975,000 settlement fund, and finding that "Courts in this District have previously awarded fees at or exceeding this level on numerous occasions").

On the other hand, none of the above cases involved a foreign corporate defendant that was effectively immune from serious merits discovery and that lacked assets against which a judgment could actually be enforced. Furthermore, at least some of the cited cases (*City of Providence*, for example, and *Maley*)[12] settled at a later point in the litigation, after motions to dismiss or even for summary judgment had been decided and/or some actual discovery (as opposed to post-settlement

---

[12] When *City of Providence* settled the case was virtually ready for trial. *Maley* settled relatively early but confirmatory discovery was undertaken at the defendant's corporate headquarters and was not limited to the availability of insurance proceeds.

28

confirmatory discovery) had taken place. Counsel's citation to *Velez v. Novartis* in support of its application is simply inexplicable; that case went to trial after full discovery and resulted in a verdict in excess of a $250 million for the plaintiffs, after which the parties settled for a sum that, if I recall correctly, was in the neighborhood of $175 million, plus significant affirmative relief that could never be enforced in a case against a corporation whose operations are in China. It is hardly an apposite precedent.

What is an apposite precedent is this court's other case involving a Chinese company, *Advanced Battery, supra*—a case cited liberally by Lead Counsel for other propositions, but not on the issue of a reasonable fee award. That is understandable, since *Advanced Battery* cuts very much against a 25%/3.99 lodestar multiple fee award. In fact, in *Advanced Battery* the attorneys actually waived any fee award—despite having done considerably more work on the case than did the attorneys in this case—and limited their request to expense reimbursement, so that a class similar in size to this one could maximize recovery out of an admittedly much smaller ($275,000) settlement fund.[13]

As noted above, the Second Circuit "encourage[s] the practice of requiring documentation

---

[13] By the time the parties agreed to settle the *Advanced Battery* litigation, Lead Counsel had, among other things:

- reviewed and analyzed defendant Advanced Battery's (or ABAT's) Class Period and pre-Class Period public filings, annual reports, press releases, quarterly earnings call and investment conference transcripts, and other public statements;
- collected and reviewed a comprehensive compilation of analyst reports and major financial news service reports on ABAT;
- reviewed and analyzed stock trading data relating to ABAT;
- utilized the services of a private investigator in China, who located and interviewed ABAT customers and former employees, visited certain ABAT production facilities in China and obtained ABAT's Chinese regulatory filings;
- researched, investigated, and drafted one of the initial complaints (*Cohen Action*, D.E. 1) and the First Amended Complaint (D.E. 52);
- researched and drafted the motion to appoint the Lead Plaintiff (D.E. 16, 17, 40);
- researched and drafted memoranda opposing Defendants' Motions to Dismiss (D.E. 79);

of hours as a 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209

F.3d at 50 (citation omitted); *accord, e.g., Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,

258 F. Supp. 2d 254, 263 (S.D.N.Y. 2003); *Telik*, 576 F. Supp. 2d at 588.  I categorically reject

the notion that the requested fees – 3.99 times lodestar – would be reasonable.  This is a case where

the only work that was done was to file a complaint and get the case settled.  The notion that any

lodestar multiple, let alone one that is quadruple the lodestar amount, would be "reasonable" is,

with all respect to counsel, absurd.  I so conclude even though no member of the class has filed an

objection to the fee request,[14] and even though I have no quarrel with the rates charged by

counsel.[15]

There is no inconsistency between finding that counsel were sufficiently informed to make

a reasonable settlement decision and concluding that they did not do nearly enough work to merit

the fee award they seek.  Sufficient work was done in this case to satisfy this court that the $3

million from insurance proceeds substantially exceeds what would be available to the class

members after full litigation, but that fact might well have been intuited before the lawsuit was

filed.  The amount of work actually done by Lead Counsel on this case does not warrant an award

of 25% of the settlement fund, or anything close to it.  I am prepared to award 10% of the settlement

---

- researched and drafted Lead Plaintiff's motion to strike documents offered by the ABAT Defendants (D.E. 80, 81, 88); and
- researched and drafted Lead Plaintiff's motion for class certification (D.E. 94, 95) and supporting memoranda of law thereto.

The Court had also denied the motion to dismiss; no such ruling was made in this case because Lead Plaintiff's counsel did not even file a brief in opposition to that motion. The only party who did significant work on the motion was Defendants' counsel.

[14] I would not be surprised to learn that they figured it was not worth the trouble.

[15] The number of hours worked appears to be excessive, if only because too many lawyers worked on this case—given the inability to pay a great deal of attention to the merits, one partner and one associate would seem to have been an appropriate level of staffing.  But in view of my conclusion that the fee award should be substantially reduced, I see no need to delve further into that issue.

fund and not a penny more for attorneys' fees. Ten percent exceeds the lodestar amount by a modest amount (a lodestar fee would be 6.25% of the settlement fund)—one that does not offend the court in view of the amount of the settlement fund.

## C. A 10% of Fund Attorneys' Fee Is Reasonable Based On The *Goldberger* Circuit Criteria

The *Goldberger* Court held that the appropriate percentage fee in a class action is a matter of judicial discretion that "should be assessed based on scrutiny of the unique circumstances of each case . . . ." *Goldberger*, 209 F.3d at 53. The Second Circuit did, however, set forth the factors that should be considered by district courts in arriving at a suitable percentage. Specifically, the court held that:

> [D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Id.* at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)). I judge my proposed award of 10% of the settlement fund against that standard.

The *Goldberger* factors were discussed extensively above, in the section of this opinion approving the settlement. There is no need to repeat that discussion here; they support a 10% fee award. Two factors, however, deserve mention.

The first, which is briefed at length by Lead Counsel, is the contingent nature of this case, and the fact that Lead Counsel took a financial risk in bringing it. That is true. However, in justifying the settlement amount, Lead Counsel cited this Court to cases, and especially to scholarship, demonstrating that suits against Chinese companies settle for a discount off any available D&O insurance—and generally without a lot of merits-based work—precisely because

31

the defendant companies are effectively judgment-proof and immune from or indifferent to the usual incentives to cooperate with U.S. discovery practices. *See infra.*, pages 11-12 and 16. I assume that Lead Counsel were aware of these facts when they chose to bring this lawsuit and then volunteered for the position of Lead Counsel—which no one else wanted. That mitigates the risk generally assumed by plaintiff's counsel in securities fraud class actions.

The second factor is public policy considerations. It is indeed the case that public policy favors private attorneys general who enforce the securities laws by bringing warranted lawsuits; ordinarily that consideration cuts in favor of a lodestar multiple fee award. But as noted above in several footnotes, the real question raised by this and similar lawsuits (of which there are many) is whether public policy favors allowing foreign corporations to raise money in highly regulated U.S. securities markets when they are effectively immune from that regulation—whether enforcement action be commenced by private attorneys general or public regulators. Since the end of lawsuits against such companies—quick settlement for a percentage of some relatively modest D&O policy, with no significant inquiry into the truth of the allegations of malfeasance—appears to be foreordained on the day they are filed, it is hard to see why the courts should be cluttered with them. I see no public policy justification for a higher fee award in this case.

## VI.    THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *Flag Telecom*, 2010 U.S. Dist. LEXIS 119702 at *86 (citing *Teachers' Ret. Sys.*, 2004 U.S. Dist. LEXIS 8608, at *17; *Am. Bank*, 127 F. Supp. 2d at 430). "'Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.'" *EVCI*, 2007 U.S. Dist. LEXIS 57918, at *57 (quoting *In re Arakis*

32

*Energy Corp., Sec. Litig.*, No. 95 CV 3431 (ARR), 2001 U.S. Dist. LEXIS 19873, at \*57 n.12 (E.D.N.Y. Aug. 17, 2001)).   Courts have awarded such expenses so long as counsel's documentation of them is "adequate." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998).

In the MacFall Declaration and the accompanying Exhibit A, Lead Counsel detail and document the $30,646.62 in expenses reasonably incurred in connection with prosecution of the Action.  MacFall Decl. Ex. A.  These expenses are of the type that law firms typically bill to their clients and include such things as:  mediator fees, expert fees, computer research, photocopying, postage, meals, and court filing fees.  Lead Counsel also expended $18,070.17 for their damage expert, who helped shape the Plan of Allocation, and incurred $237.50 in costs for duplicating and imaging services.  Lead Counsel also expended $8,714.10 in mediator fees and $1,335.01 in costs for electronic research, including Westlaw and Lexis.  All of these expenses are customary and necessary expenses for this complex securities action, and were necessary for Lead counsel to successfully prosecute this case. *See, e.g., Flag Telecom*, 2010 U.S. Dist. LEXIS 119702, at \*87 Finally, as noted above, no objections have been submitted with respect to expenses.

Therefore, the Court awards reimbursement of expenses in the amount of $30,646.62.

34

## CONCLUSION

For the reasons set forth above, the Settlement and Plan of Allocation are approved. Lead Counsel are awarded attorneys' fees in the amount of 10% of the Settlement Fund, and the reimbursement of expenses in the amount of $30,646.62. Defendants' motion to dismiss is denied as moot.

The Clerk of the Court is directed to remove Docket Nos. 23 and 37 from the Court's list of pending motions and to close the file.

Dated: September 4, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

34